# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANDREW MITTOWER,
     Petitioner,

vs.

WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,
     Respondent.

Civil Action No. 1:10-cv-750

Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Petitioner, an inmate in state custody at the Chillicothe Correctional Institution in

Chillicothe, Ohio, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §

2254. The case is before the Court on the petition; respondent's return of writ with exhibits,

including the trial transcript; and petitioner's response to the return of writ. (Docs. 4, 9, 12).

## I. PROCEDURAL HISTORY

### State Trial Proceedings

On May 2, 2007, the Butler County, Ohio, grand jury returned an indictment charging

petitioner with one count of aggravated theft in violation of Ohio Rev. Code § 2913.02(A)(3)

(Count One); three counts of forgery in violation of Ohio Rev. Code § 2913.31(A)(3) (Counts

Two through Four); and one count of money laundering in violation of Ohio Rev. Code §

1315.55(A)(1) (Count Five). (Doc. 9, Ex. 1).

Petitioner waived his right to a jury trial and elected to be tried by the court. (Doc. 9, Ex.

2). Following a bench trial, the court found petitioner guilty as charged. (Doc. 9, Ex. 3). On

March 1, 2008, petitioner was sentenced to an aggregate prison term of eleven (11) years, which

consisted of the following consecutive terms of imprisonment: five (5) years for the aggravated

theft offense; one (1) year for the forgery offense charged in Count Two;[1] and five (5) years for

the money laundering offense.  (Doc. 9, Ex. 4).

## State Appeal Proceedings

Petitioner's trial attorney filed a timely notice of appeal to the Ohio Court of Appeals,

Twelfth Appellate District.  (Doc. 9, Ex. 5).  With the assistance of new counsel for appeal

purposes, petitioner presented the following assignments of error:

> 1.  The trial court's judgment of conviction for money laundering in violation of
> R.C. 3115.55(A)(1) is not supported by sufficient evidence.
>
> 2.  The trial court's judgment of conviction for money laundering in violation of
> R.C. 3115.55(A)(1) is against the manifest weight of the evidence.
>
> 3.  The defendant cannot be convicted of and sentenced for both theft and money
> laundering as under the facts of this case the two are allied offenses of similar
> import.

(Doc. 9, Ex. 6).

On March 30, 2009, the Ohio Court of Appeals issued a Judgment Entry overruling the

assignments of error and affirming the trial court's judgment.  (Doc. 9, Ex. 8).

With the assistance of his appellate counsel, petitioner next filed a timely appeal to the

Ohio Supreme Court, raising the following claim as the sole proposition of law:

> Where funds belonging to a valid corporation are used to pay an authorized and
> legitimate corporate expense from the corporate checking account, they cannot be
> "proceeds" of unlawful activity within the meaning of R.C. 1315.55(A).

(Doc. 9, Exs. 9-10).

On July 29, 2009, the Ohio Supreme Court denied petitioner leave to appeal and

summarily dismissed the appeal "as not involving any substantial constitutional question."  (Doc.

---

[1]One-year prison terms also were imposed on the remaining two forgery charges, with the sentences to be
served concurrently with the sentence imposed for the forgery offense charged in Count Two.  (*See* Doc. 9, Ex. 4).

9, Ex. 11).

## Federal Habeas Corpus

Petitioner initiated the instant habeas corpus action in October 2010.[2] (*See* Doc. 4). In the petition, he alleges four grounds for relief:

**Ground One:** Where funds belonging to a valid limited liability company are used to pay an authorized and legitimate corporate expense from the corporate checking account, they cannot be the "proceeds" of unlawful activity within the meaning of ORC 1315.55(A).

**Ground Two:** The state courts' judg[]ment of conviction for money laundering under ORC 1315.55(A)(1) is not supported by sufficient evidence and is against the manifest weight of the evidence.

**Ground Three:** The petitioner could not be convicted of and sentenced for both theft and money laundering or theft and forgery as under the facts of this case the two are allied offenses of similar import under ORC 2941.25.

**Ground Four:** The petitioner could not be sentenced to consecutive prison terms without the trial court making the required findings pursuant to ORC 2929.14(E)(4).

(Doc. 4, pp. 9, 12, 14, 16).

In the return of writ filed in response to the petition, respondent contends that petitioner procedurally defaulted and has waived the claims alleged in Grounds Two through Four of the petition, and is not entitled to relief based on the merits of the claim alleged in Ground One. (Doc. 9, Brief, pp. 8-9, 10-16). Respondent also argues that the manifest-weight-of-the-evidence claim alleged in Ground Two and the sentencing-error claim alleged in Ground Four concern issues of state law, which are "not cognizable on habeas corpus review." (Doc. 9, Brief, pp. 9-10).

---

[2]Although the petition was officially docketed as filed on November 8, 2010, petitioner filed an *in forma pauperis* application to initiate the action on October 26, 2010. (*See* Doc. 1). Petitioner also certified in both the pauper application and attached habeas corpus petition filed on that date that he had served the Office of the Ohio Attorney General with the pleadings on October 20, 2010. (*See* Docs. 1, 4).

## II. OPINION

### A. Petitioner Procedurally Defaulted And Has Waived The Claims Alleged In Grounds Three and Four Of The Petition

In Ground Three of the petition, petitioner essentially alleges that he received multiple punishments for the same offense when he was convicted and sentenced for both theft and money laundering and both theft and forgery, because the two sets of crimes are "allied offenses of similar import" under Ohio Rev. Code § 2941.25. (Doc. 4, p. 14). In Ground Four, petitioner claims that the trial court erred in imposing consecutive sentences without making certain findings required by Ohio law. (Doc. 4, p. 16). Respondent argues in the return of writ that petitioner procedurally defaulted and has waived the two grounds for relief.[3] (Doc. 9, Brief, pp. 8-9). Respondent's argument has merit.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990);

---

[3]Respondent also argues that petitioner procedurally defaulted the claims alleged in Ground Two challenging the weight and sufficiency of evidence supporting his money-laundering conviction. However, upon review of the record, it appears that those claims were fairly presented to the Ohio courts for consideration to the extent petitioner argued on appeal to both the Ohio Court of Appeals and Ohio Supreme Court that he could not be found guilty of money laundering because, as alleged in Ground One, the charged offense did not involve "proceeds" of unlawful activity, but rather "funds belonging to a valid corporation . . . used to pay authorized and legitimate corporate expenses." (*See* Doc. 9, Ex. 6, pp. 8-12; Ex. 10, pp. 3-4; *see also* Doc. 4, pp. 9, 12). Therefore, the undersigned concludes that petitioner has not waived the claims alleged in Ground Two to the extent such claims were raised to the state courts in conjunction with the non-defaulted issue presented in Ground One.

*Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir. 1985). If the petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review. *See O'Sullivan,* 526 U.S. at 847-48; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If it is determined that the petitioner procedurally defaulted his claims in the state courts, federal habeas review is precluded unless the petitioner can demonstrate cause for the procedural defaults and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Harris,* 489 U.S. at 262; *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

Here, as respondent has argued, petitioner did not satisfy the fair presentation requirement and, therefore, has procedurally defaulted the claims alleged in Grounds Three and Four of the petition because he never presented those claims to the Ohio Supreme Court for consideration. With respect to the claim alleged in Ground Three, although petitioner asserted an assignment of error on direct appeal to the Ohio Court of Appeals challenging his multiple convictions for both theft and money laundering, he did not re-assert the claim as a proposition of law on further appeal to the Ohio Supreme Court. (*See* Doc. 9, Ex. 6, pp. 13-14; Ex. 10). Moreover, with respect to the claim alleged in Ground Four, petitioner did not raise any claim challenging the imposition of consecutive sentences in the state appeal proceedings. Because petitioner thus

failed to present the state's highest court with an opportunity to correct the errors alleged in Grounds Three and Four of the petition, he has waived the claims unless he demonstrates cause for and prejudice from his procedural defaults or that failure to consider the claims will result in a "fundamental miscarriage of justice." *See, e.g., Coleman,* 501 U.S. at 750; *Murray,* 477 U.S. at 485.

Petitioner has not shown that failure to consider his claims for relief will result in a "fundamental miscarriage of justice," or in other words, that the alleged errors "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). Although petitioner has challenged the weight and sufficiency of evidence supporting his money-laundering conviction, actual innocence means factual innocence, not mere legal insufficiency. *See House v. Bell,* 547 U.S. 518, 538 (2006); *Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006) (citing *Bousley v. United States,* 523 U.S. 614, 623 (1998)); *Wright v. Lazaroff*, 643 F. Supp.2d 971, 989 (S.D. Ohio 2009) (Barrett, J.; Hogan, M.J.); *see also Vanwinkle v. United States,* 645 F.3d 365, 369 (6th Cir. 2011).

Moreover, petitioner has not demonstrated cause for his procedural defaults in the state courts. Petitioner has suggested in his brief in response to the return of writ that his appellate counsel acted improperly in abandoning the claim alleged in Ground Three over petitioner's objection. (Doc. 12, p. 14). Although it is well-settled that appellate counsel's ineffectiveness may constitute cause for a procedural default occurring in an appeal as of right to the Ohio Court of Appeals, *see Murray,* 477 U.S. at 488-89, cause cannot be established if the ineffective assistance of counsel claim also was procedurally defaulted. *See, e.g., Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *Landrum v. Mitchell,* 625 F.3d 905, 934 (6th Cir. 2010), *cert. denied,* _ S.Ct. _, 2011 WL 4530517 (U.S. Oct. 3, 2011) (No. 10-9911). Here, petitioner has waived any

argument of "cause" based on his appellate counsel's ineffectiveness, which he has asserted for the first time in response to the return of writ filed in the instant action.

In any event, attorney error amounting to ineffective assistance cannot constitute cause "where the error caused a petitioner to default in a proceeding in which the petitioner was not constitutionally entitled to counsel, including a discretionary appeal." *Tanner v. Jeffreys,* 516 F. Supp.2d 909, 916 (N.D. Ohio 2007) (quoting *Barkley v. Konteh,* 240 F. Supp.2d 708, 714 (N.D. Ohio 2002), in turn citing *Coleman,* 501 U.S. at 751-53); *see also Pennsylvania v. Finley,* 481 U.S. 551, 556 (1987); *Wainwright v. Torna,* 455 U.S. 586, 587-88 (1982); *Ross v. Moffitt,* 417 U.S. 600, 616 (1974). *Cf. Garrett v. Moore,* No. C-1-05-102, 2007 WL 315093, at *1, *5 (S.D. Ohio Jan. 30, 2007) (Weber, S.J.; Hogan, M.J.) (holding that because the right to effective assistance of counsel does not extend beyond the first appeal as of right to a discretionary appeal, petitioner was unable to establish that the ineffectiveness of his counsel, who represented him on discretionary appeal to the Ohio Supreme Court, in failing to assert all the claims of error that had been raised to the Ohio Court of Appeals, constituted cause for his procedural default); *Whittsette v. Gansheimer,* No. 1:08cv245, 2008 WL 4682656, at *3-4, *9-11 (N.D. Ohio Oct. 22, 2008) (same); *Wright v. Bobby,* No. 1:05cv02870, 2008 WL 2484170, at *1, *17-18 (N.D. Ohio June 17, 2008) (same).[4] Because the claim alleged in Ground Three was raised by counsel on appeal to the Ohio Court of Appeals and the default occurred in the discretionary appeal to the Ohio Supreme Court, petitioner is unable to prevail on any claim that counsel's ineffectiveness constitutes cause in this case.

---

[4]*Contrast Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 433-35 (6th Cir. 2006) (holding that the constitutional right to effective assistance of counsel during a direct appeal as of right does "not terminate the moment the court of appeals hands down its decision," but extends to include the duty of informing one's client of the outcome of the proceeding; such a claim of ineffectiveness on the part of petitioner's appellate counsel is not raised in the instant proceeding).

Petitioner also suggests that cause exists for his procedural default of the claim alleged in Ground Four, because of an intervening change in law that occurred on January 14, 2009, when the Supreme Court issued its decision in *Oregon v. Ice*, 555 U.S. 160 (2009), after he was convicted and sentenced, but during the pendency of the state appeal proceedings. Petitioner, however, has failed to explain why he did not attempt to raise a claim based on *Ice* before the Ohio Court of Appeals affirmed the trial court's judgment of conviction over two months later, on March 30, 2009.

In any event, *Ice* does not apply to petitioner's sentence, which was imposed in March 2008 in accordance with state-law standards in effect at that time. Specifically, prior to *Ice*, the Ohio Supreme Court had ruled in *State v. Foster,* 845 N.E.2d 470 (Ohio 2006), that portions of Ohio's sentencing statutes, including a provision requiring the trial judge to make certain findings before imposing consecutive sentences, violated the Sixth Amendment under the Supreme Court's decision in *Blakely v. Washington,* 542 U.S. 296 (2004). To remedy the constitutional defects, the *Foster* court severed the unconstitutional provisions and held, among other things, that the trial court had "full discretion" to impose consecutive prison terms without making findings or giving reasons for its decision. *Foster,* 845 N.E.2d at 497-99. Nearly three years later, in *Ice*, the Supreme Court upheld the constitutionality of Oregon's sentencing statute, which like Ohio's pre-*Foster* statute, required the trial judge to make factual findings prior to imposing consecutive sentences. In so ruling, the Court reasoned that the imposition of consecutive sentences does not implicate constitutional concerns under the Sixth Amendment. *See Ice*, 555 U.S. at 167-69.

It appears that petitioner is arguing in the instant action that *Ice* applies to his sentence, because the decision effectively mandated reinstatement of the pre-*Foster* provisions requiring

judicial fact-finding, which were never repealed by the Ohio General Assembly.  However, the

Ohio Supreme Court has rejected such an argument, holding that "*Ice* does not revive the

disputed statutory provisions and that defendants who were sentenced by trial judges [pursuant to

*Foster*] are not entitled to resentencing."  *State v. Hodge,* 941 N.E.2d 768, 770 (Ohio 2010), *cert.*

*denied*, 131 S.Ct. 3063 (2011).   In so holding, the *Hodge* court provided the following summary

of its reasoning:

> *Ice*'s impact on Ohio law is collateral.  Our decision in *Foster* was not on direct
> appeal in *Ice* and *Ice* did not directly overrule *Foster*.  Nearly five years have
> passed since *Foster* definitively and unequivocally severed the consecutive-
> sentencing sections, along with other provisions, from the statutory sentencing
> framework, and ordered resentencing for those defendants whose cases were then
> on direct appeal.
>
> Numerous defendants have received consecutive sentences that have met all
> constitutional requirements from trial court judges acting in reliance on *Foster* . . .
> and other precedents.  Considering also that (1) judicial fact-finding is not
> constitutionally required in order to impose consecutive sentences, (2) none of our
> precedents have given notice to the General Assembly that provisions of the
> Revised Code that have been held unconstitutional and have been severed would
> be revived, perhaps many years after their enactment and subsequent invalidation,
> and (3) other considerations against revival strongly outweigh the considerations
> in favor of revival, we reject the concept of automatic revival under the
> circumstances presented here.
>
> For all the foregoing reasons, we hold that the decision of the United States
> Supreme Court in *Oregon v. Ice* does not revive Ohio's former consecutive-
> sentencing statutory provisions, . . . which were held unconstitutional in *State v.*
> *Foster*.  Because the statutory provisions are not revived, trial court judges are not
> obligated to engage in judicial fact-finding prior to imposing consecutive
> sentences unless the General Assembly enacts new legislation requiring that
> findings be made.

*Id.* at 777.

The Ohio Supreme Court's decision in *Hodge* undermines any argument by petitioner that

the pre-*Foster* sentencing provisions apply to him.  Moreover, petitioner is unable to prevail on

any claim that his sentence is subject to reversal because the Ohio legislature reenacted the

excised provision governing consecutive sentencing after *Ice* was decided. Recently, on the authority of *Hodge*, the Ohio Supreme Court reversed an appellate court decision holding that the Ohio General Assembly had reenacted the pre-*Foster* provision when it amended the statute on April 7, 2009, and that therefore "a sentencing judge, pronouncing a sentence after April 7, 2009, must again, as before *Foster*'s release, make certain findings of fact before imposing consecutive sentences on a defendant." *See State v. Jordan,* 943 N.E.2d 565, 566 (Ohio 2011), *reversing* No. 2009-T-0110, 2010 WL 4215705, at *3-4 (Ohio Ct. App. Oct. 22, 2010).

This Court must defer to and is bound by the Ohio Supreme Court's rulings in *Hodge* and *Jordan* "as defining state law" governing post-*Foster* consecutive sentencing determinations. *See West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 236 (1940); *see also Hicks v. Feiock,* 485 U.S. 624, 629-30 & n. 3 (1988) (applying *West* standard in federal habeas case). Therefore, petitioner, who was sentenced in March 2008, is unable to demonstrate for purposes of establishing "cause" for his procedural default that the Supreme Court's *Ice* decision has any bearing on this case. *Cf. Ahmed v. Hall*, No. 1:09cv624, 2011 WL 2970945, at *3-4 (N.D. Ohio July 20, 2011) (adopting a Report and Recommendation to deny a motion to amend a habeas petition to add a claim challenging the imposition of consecutive sentences under *Foster* in light of *Ice*, after finding the Ohio Supreme Court's *Hodge* decision "[m]ost damaging to Ahmed's dependency upon *Ice* to support his entitlement theory").

Accordingly, in sum, the undersigned concludes that petitioner procedurally defaulted and has waived the claims alleged in Grounds Three and Four of the petition in the absence of a showing of cause for his defaults in the state courts or that a fundamental miscarriage of justice will occur if the defaulted claims for relief are not considered herein.

**B. Petitioner Is Not Entitled To Habeas Relief Based On The Claims Alleged In Grounds One And Two Of The Petition Challenging His Money-Laundering Conviction**

In Grounds One and Two of the petition, petitioner challenges the weight and sufficiency of the evidence supporting his conviction for money laundering. He essentially contends that he could not be convicted of money laundering based on the facts that the State relied on to prove that charge. (*See* Doc. 4, pp. 9-14).

As background, evidence was introduced at trial that over the course of two to three years, petitioner cultivated friendships with Sudhir Nelvagal, James Nasca and Frank Smith, when they frequently met to play tennis together. (*See* Doc. 9, Trial Tr. 18-20, 135, 217). In the late summer or fall of 2005, petitioner approached the three men about joining with him in a business venture involving the purchase of land in West Chester, Ohio, and the development of an urgent care facility on that property. (Doc. 9, Trial Tr. 20, 135-37, 218-21). On October 24, 2005, the four men signed an "operating agreement," which had been prepared in advance by petitioner, establishing a corporation, Treadstone Development LLC ("Treadstone"), that they agreed to invest in equally with each person providing a "seed money" contribution of $50,000 to the corporation. (Doc. 9, Trial Tr. 21-22, 142-45, 219-21).

A corporate account was set up by petitioner with Huntington Bank, which the investors understood would serve initially as a "holding account" to take in monies and attract other investors with only "minimal expenses" to be paid out. (Doc. 9, Trial Tr. 26, 147-48, 165, 231-32, 241). All four men signed on as "signatories" to the account. (Doc. 9, Trial Tr. 30, 86, 148, 234). However, Nelvagal, Nasca and Smith did not receive monthly statements from the bank, nor did they obtain access to the account until August 2006 after matters had "unraveled." (Doc. 9, Trial Tr. 30-31, 63-65, 68-69, 90, 166-67, 238-39, 264-65).

Nelvagal gave petitioner a $10,000 check on October 24, 2005 as his initial contribution

to the Treadstone project, followed by a $30,000 check in November or December of 2005 and two $5,000 checks between December 2005 and April 2006. (Doc. 9, Trial Tr. 23, 28). Nasca gave petitioner checks amounting to approximately $43,000 to deposit in the corporate account in December 2005. (Doc. 9, Trial Tr. 147). Smith contributed his $50,000 share on June 21, 2006. (Doc. 9, Trial Tr. 237-38). Although petitioner indicated to Nelvagal, Nasca and Smith that he was putting in his $50,000 contribution at the same time Nelvagal handed over his initial $10,000 check in October 2005, petitioner did not deposit any funds into the corporate account. (Doc. 9, Trial Tr. 23, 25, 29, 70). Instead, petitioner deposited Nelvagal's $10,000 contribution directly into his personal bank account at Key Bank. (Doc. 9, Trial Tr. 26, 278-79).

During the period between October 2005 and April 2006, petitioner led his three "partners" to believe that he had negotiated with Schumacher Dugan, a property developer in the West Chester area, to purchase two acres of land for $350,000 per acre with a $50,000 "down payment" made in November 2005 to hold the land; that his mother had invested $200,000 as an "angel investor" in the project; and that in March 2006, Dr. Philip Lam had signed a long-term commercial lease agreement and deposited a $17,000 check to secure the lease on a building to be developed on the property. (Doc. 9, Trial Tr. 32, 48-51, 142, 145-46, 152-54, 220, 222, 225-28, 232). In actuality, petitioner's mother did not invest any money in the project. (*See* Doc. 9, Trial Tr. 70). Moreover, Dr. Lam testified that he told petitioner he was not interested in opening up an office at the proposed urgent care center and that he never signed a "letter of intent," entered a lease agreement or presented anyone with a $17,000 check to secure a lease on the property to be developed. (*See* Doc. 9, Trial Tr. 120-24, 128). Finally, Mark Schumacher testified that although petitioner had made a few phone calls to the Schumacher Dugan office, he never met petitioner, nor had the company ever received monies from petitioner for the purchase

of land or accepted any form of down payment for two acres of land for the purpose of developing a medical center on the property. (Doc. 9, Trial Tr. 268-69).

During that time period, Nelvagal set up a meeting with an architect friend and the friend's partner to assist with the project. (Doc. 9, Trial Tr. 42-43). The architects "came up with some designs" and drafted "some renderings" after that meeting. (Doc. 9, Trial Tr. 43). They asked to be reimbursed in the amount of $3,000 "for the initial architectural renderings," with negotiations to continue regarding the fee they would ultimately receive for their services. (Doc. 9, Trial Tr. 44). The architects were paid $3,000 for the initial designs and as a "good faith deposit" by way of a check dated January 31, 2006 "made out from Treadstone Development LLC to McKay Snyder Architects." (Doc. 9, Trial Tr. 46).

At a meeting held on April 1, 2006, petitioner showed Nelvagal, Nasca and Smith the Treadstone account "balance sheet," which indicated an outstanding balance of $295,000 held on deposit in the corporate account with $62,128 still owed to the company by the three men. (Doc. 9, Trial Tr. 56-58, 162, 232-33). Nelvagal immediately wrote a check for $5,000 to cover his "capital contribution to the company." (Doc. 9, Trial Tr. 58). Nelvagal testified as follows regarding the parties' understanding on April 1, 2006 as to "what was going to be going on now with this project:"

> Well, we were technically supposed to have broken ground around March, but it just became a moving goal post. So roughly around that time frame we still had not acquired the land and [petitioner] was the sole negotiator with Dr. Lam as well as with Schumacher with acquiring the land and getting feedback on the architectural designs.
>
> So, while that was going on, we were . . . trying to seek other venture capitalists and also at the same time we were building financial models so that we could find out when the project would be viable and things like that. And we were also applying. Around this time frame over a period of time, we had provided financial statements to banks in order to seek a loan.

(Doc. 9, Trial Tr. 59).

In early June 2006, before Smith made his $50,000 contribution to the development project, petitioner showed Nelvagal, Nasca and Smith a "letter of intent" purportedly signed by Dr. Joseph Lindeman, a chiropractor, expressing his interest in becoming another investment partner in the project and in entering a lease agreement for space in one of the buildings to be developed. (Doc. 9, Trial Tr. 61-62, 163-64, 237). According to Nasca, petitioner said Lindeman planned to invest $500,000 so that the project could be expanded from a two-acre to a twelve-acre development. (Doc. 9, Trial Tr. 164). However, Dr. Lindeman testified that he was not interested in investing in the business venture or leasing office space in the property to be developed and did not sign or authorize anyone to sign the "letter of intent" shown to Nelvagal, Nasca and Smith in June 2006. (Doc. 9, Trial Tr. 211-13).

Soon after Smith handed over his $50,000 capital contribution on June 21, 2006, the three men began to have growing concerns about petitioner and the viability of the project that he had represented to them. Nelvagal testified in pertinent part as follows about the matters giving rise to their doubts:

> Well, the fact that we didn't see any progress on the acquisition of the land, we only saw these letters of intent from Dr. Lindeman, the . . . supposed investment from Dr. Lindeman, and we were concerned that since Dr. Lam had signed the lease agreement in March and he had given a $17,000 check that he would be interested in seeing the ground . . . broken for this project and we were concerned that there wasn't any progress and so we wanted to know what was going on with this. And [petitioner] mentioned at that time that Dr. Lam's wife had breast cancer and that she was going through chemotherapy and various other things and Dr. Lam's mind was not entirely on this, and Dr. Lam wasn't concerned even if we didn't break ground by November or December of that year. And around the same time his focus had moved because now we were starting conversations on fully acquiring those two acres or making plans and we wanted to see some progress with banks and by then we had gone to Huntington Bank for a loan. We were trying to negotiate with Huntington to get some loan. And [petitioner] called

14

and left a message on my . . . cell phone saying that we had been approved for a 1.3 million dollar loan from Huntington. And much later we realized that we weren't approved for anything.

And also around this same time, he mentioned that Schumacher was busy with some other construction projects. There were some stall tactics that we saw and we were concerned about that.

**** 

[In August, petitioner] was leaving for the World Series of Poker tournament and at that time we supposedly – Schumacher had agreed to get signage up on that land saying that an urgent care center was coming up. So we wanted to follow-up while [petitioner] was away. We wanted to follow up on getting that signage on the piece of property and so we wanted to make a few calls to Schumacher and he said his wife, Karen Lauer, can take care of that interaction. So we were a little concerned that it was always [petitioner] or Karen who was in the middle of liais[on]ing with either Schumacher or Dr. Lam and that we didn't have face time with some of these important clients or sellers.

So at that time, . . . I called Karen Lauer and left a message on her cell phone asking if she knew or if she had any status report on when the signage would go up on the piece of property and I didn't get a response. And roughly at that time frame we all started getting a little antsy about this whole thing because . . . there were a couple of red flags that were popping up now. And then one day I decided to call Huntington Bank to find out how much money was left in our account. And at that time I found out there was only about $12,000 left and that was the time it started unraveling.

(Doc. 9, Trial Tr. 63-65).

The Huntington Bank records revealed that petitioner had depleted the corporate account by making numerous withdrawals over the course of the previous several months, beginning with an $8,000 withdrawal on November 18, 2005, when the account was opened by petitioner, and ending with withdrawals of more than $50,000 in the months of June and July 2006. (Doc. 9, Trial Tr. 65-73). In addition, the Huntington Bank records revealed that in April 2006, when petitioner presented Nelvagal, Nasca and Smith with an account statement showing corporate assets of $295,000 on deposit in the bank, only $30,000 actually remained in the account. (Doc.

9, Trial Tr. 70). None of the withdrawals made payable to petitioner were authorized by the Treadstone membership. (Doc. 9, Trial Tr. 74).

The only check that Nelvagal, Nasca and Smith "were aware of and authorized" was the $3,000 check issued from the corporate account to the architects in January 2006 for their initial design renderings. (Doc. 9, Trial Tr. 75). Nelvagal testified that if the payment had not been made to the architects, he would have had "doubts about the project moving forward," which would have resulted in his "pulling back or taking out [his] money and asking for explanations." (Doc. 9, Trial Tr. 76-77). At that time, Nelvagal had not made his final contribution of $5,000 to the development project, Nasca still owed approximately $7,000, and Smith had not contributed any portion of his $50,000 investment-share in Treadstone.

The aggravated-theft and forgery charges stemmed from petitioner's acts of deception and unauthorized withdrawal of monies intended for deposit in the Treadstone account during the course of the sham business venture. The money-laundering charge is based on the $3,000 payment that was made in January 2006 to the architectural firm. As the prosecuting attorney explained in his opening statement:

> The evidence will show, Judge, from the very beginning that Mr. Mittower deceived these three gentlemen. . . . In part of this charge you will notice that the last count has to do with the money laundering. . . . What the State will present in the way of evidence [is that] there is one expense that . . . actually would have worked perhaps for the development of this project if there was one to begin with. It has to do with a check to a McKay Snyder Architects. They were brought in by Mr. Sudhir Nelvagal, friends of his because he was still believing that this concept was really going to become a reality and they needed to have an architect. They actually met with these architects again with Mr. Mittower at his residence, but of course the architect is not going to work for free. They were going to do renderings but they wanted money, $3,000 for starters. It was at that point in time, that Mr. Mittower then issued, shortly after, this check for $3,000. Because had he not, a flag would have gone up as to why wasn't this being paid. And it is so charged that this was the continuation of the theft because yet to be paid in was Frank Smith's money, and the remainder of Mr. Nasca's and the remainder of Mr.

Sudhir's.

(Doc. 9, Trial Tr. 13-14).

After all the evidence was presented and closing arguments were heard, the trial court found petitioner guilty beyond a reasonable doubt of aggravated theft based on the finding that he deprived "three owners" of property worth between $100,000 and $500,000 by "knowingly obtain[ing] or exert[ing] control over such property or services by deception." (Doc. 9, Trial Tr. 329-30). The court also found petitioner guilty beyond a reasonable doubt on the three forgery counts based on findings that petitioner, "with purpose to defraud or knowing that he was facilitating a fraud, did utter," or possessed with purpose to utter, the following documents that he knew were forged: a "letter of intent" and commercial lease agreement purportedly signed by Dr. Lam and a "letter of intent" purportedly signed by Dr. Lindeman. (Doc. 9, Trial Tr. 330-31).

Finally, the trial court found petitioner guilty beyond a reasonable doubt on the money-laundering charge. In addressing the count, the court stated:

> Count Five . . . is a statute that arises seldom in criminal cases, at least those before me. . . . It is somewhat of a curious statute, but basically the indictment reads as follows: That on or about January 31st, and that would be the date of that check for $3,000, . . . Andrew Mittower did conduct or attempt to conduct a transaction knowing that the property involved in the transaction, which would be the $3,000 behind the check there, knowing that the property involved in the transaction is the proceeds of some form of unlawful activity, which in this case would be theft, with the purpose of committing or furthering the commission of corrupt activity. And again, I find the State has met its burden, has proved beyond a reasonable doubt each of the essential elements in the crime of money laundering. . . .

(Doc. 9, Trial Tr. 331-32).

On direct appeal, petitioner did not challenge the evidence supporting his convictions for aggravated theft and forgery. (*See* Doc. 9, Exs. 6, 10). However, he did assert assignments of error challenging the weight and sufficiency of evidence supporting his money-laundering

conviction. The Ohio Court of Appeals, which was the only state court to issue a reasoned decision rejecting those claims, summarily overruled the assignments of error as follows: "A thorough review of the record clearly shows that appellant issued a $3,000 check to an architectural firm for its renderings to promote and further his prior, ongoing, and future unlawful activity. Appellant's conviction for money laundering was supported by sufficient evidence and was not against the manifest weight of the evidence." (Doc. 9, Ex. 8, p. 2).

As a threshold matter, the Court must first determine the scope of review of petitioner's claims for relief that have been asserted in Grounds One and Two of the petition. In this federal habeas case, the Court has jurisdiction to review petitioner's claims only to the extent that petitioner challenges his confinement based on an alleged violation of the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran,* __ U.S. __, 131 S.Ct. 13, 16 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").

Because habeas review is limited to claims implicating federal concerns, the Court lacks jurisdiction to consider petitioner's claims to the extent he contends the trial court's verdict of guilt on the money-laundering count was against the manifest weight of the evidence. Such a claim is based on a state-law concept that is "both quantitatively and qualitatively different" from federal due process sufficiency-of-evidence principles. *See Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982); *State v. Thompkins,* 678 N.E.2d 541, 546-48 (Ohio 1997).[5] Because the claim challenging the weight of the evidence thus raises issues of state-law only, it does not constitute a

_____

[5]It is noted that *Thompkins* was superseded on other grounds by state constitutional amendment allowing for state supreme court review of manifest-weight-of-the-evidence claims in death penalty cases. *See State v. Smith,* 684 N.E.2d 668, 683-84 & n.4 (Ohio 1997).

cognizable ground for relief subject to review in this federal habeas corpus proceeding.

The Court's review, therefore, is limited solely to consideration of petitioner's claim, as argued in Grounds One and Two, challenging the sufficiency of evidence that was presented at trial to establish his guilt beyond a reasonable doubt on the money-laundering charge.

In this federal habeas case, the applicable standard of review governing the adjudication of the constitutional issues that were addressed on the merits by the Ohio Court of Appeals is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* __ F.3d __, No. 08-3247, 2011 WL 3524301, at *4 (6th Cir. Aug. 12, 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* As the

Sixth Circuit recently explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable.* . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete

bar on federal court relitigation of claims already rejected in state proceedings" and "preserves

authority to issue the writ in cases where there is no possibility fairminded jurists could disagree

that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S.Ct.

at 786. In other words, to obtain federal habeas relief under that provision, the state prisoner

must show that the state court ruling on the claim presented "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id.* at 786-87.

In determining whether or not relief should be granted on a constitutional claim that was

adjudicated by the state courts, the "federal habeas court reviewing the state-court judgment must

apply the law that controlled 'at the time his state-court conviction became final.'" *Miller v.

Stovall,* 608 F.3d 913, 919 (6th Cir. 2010) (quoting *Williams,* 529 U.S. at 390), *petition for cert.

filed,* 79 U.S.L.W. 3404 (U.S. Dec. 21, 2010) (No. 10-851); *see also Otte, supra,* 2011 WL

3524301, at *4 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte, supra,* 2011 WL 3524301, at *4 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010), *cert. denied,* __ S.Ct. __, 2011 WL 4530517 (U.S. Oct. 3, 2011) (No. 10-9911)). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

In the instant case, the Ohio Court of Appeals neither cited the relevant Supreme Court cases nor identified the clearly-established, applicable standard of review enunciated by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307 (1979), in addressing petitioner's remaining claims challenging the sufficiency of the evidence. Nevertheless, the undersigned concludes that petitioner is not entitled to habeas corpus relief because "neither the reasoning nor the result of the state-court decision contradicts" the governing Supreme Court precedents. *See Early,* 537 U.S. at 8; *see also Harrington*, 131 S.Ct. at 784.

The Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). When a sufficiency-of-evidence claim is raised in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

21

doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

The State is not required under the Due Process Clause to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the trier of fact. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)), *cert. denied,* 130 S.Ct. 1134 (2010). Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Id.* at 796-97 (and Sixth Circuit cases cited therein).

In this case, petitioner was charged with and convicted of money laundering as defined in Ohio Rev. Code § 1315.55(A)(1). (Doc. 9, Ex. 1). As the trial court indicated (*see* Doc. 9, Trial Tr. 331-32), to establish petitioner's guilt under that provision, the State was required to prove beyond a reasonable doubt that petitioner conducted or attempted to conduct "a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of corrupt activity." Ohio

Rev. Code § 1315.51(H) defines "proceeds" for the purpose of establishing a money-laundering offense as "property acquired or derived directly or indirectly from, produced through, realized through, or caused by an act or omission and includes property of any kind." Ohio Rev. Code § 1315.51(I) also provides that "'[p]roperty' means anything of value and includes an interest in property, including a benefit, privilege, claim, or right with respect to anything of value, whether real or personal, tangible or intangible." Under Ohio Rev. Code § 1315.51(B), "corrupt activity" has the same meaning as that set forth in Ohio Rev. Code §2923.31(I), which includes engaging in or attempting to engage in a theft offense under Ohio Rev. Code § 2913.02 and fraud offenses involving forgery under Ohio Rev. Code § 2913.31. *See* Ohio Rev. Code § 2923.31(I)(2)(c).

Petitioner claims that "the State failed to prove that the funds transferred by check [to the architectural firm] were 'proceeds' within the meaning of the money laundering statute." (Doc. 4, p. 9). He contends in support of that claim that he "never acquired the funds used to pay the architects' bill," which were instead "derived from the capital contributions (including his own) to Treadstone, a valid corporate entity." (Doc. 4, p. 10; *see also* Doc. 12, pp. 6-7). Petitioner further argues that the payment of a "legitimate corporate expense that had been authorized by all other partners" does not constitute the unlawful use of "proceeds" for the purpose of committing or furthering the commission of corrupt activity. (Doc. 4, pp. 9, 11-12; *see also* Doc. 12, pp. 6-7). Petitioner cites the United States Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008), as support for his arguments that his authorized payment of $3,000 from the corporate account to the architectural firm did not amount to a criminal offense. (Doc. 4, pp. 11-12; Doc. 12, pp. 8-10). The undersigned is not persuaded by petitioner's arguments.

First, *Santos* does not apply to the case-at-hand. In *Santos*, the Supreme Court was faced with the question of interpreting the term "proceeds" as it is used in the *federal* money-

laundering statute, 18 U.S.C. § 1956(a)(1). At the time *Santos* was decided, the federal statute

did not contain a provision defining that term. *See Santos*, 553 U.S. at 511. In a plurality

decision, in which Justice Stevens cast the deciding fifth vote in a concurring opinion, the Court

held that in the context of an illegal-gambling operation under 18 U.S.C. § 1956, "proceeds"

means "profits," not "receipts."[6] *Id.* at 514, 524-28; *see also United States v. Kratt*, 579 F.3d

558, 560 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 2115 (2010). The federal money-laundering

statute is not at issue in this case. Indeed, in contrast to the federal statute addressed in *Santos*,

the Ohio statute provides a definition of the term "proceeds," which reasonably could be

construed by the Ohio Court of Appeals to include the monies received from Nelvagal and Nasca

by January 31, 2006, to the extent the funds were deposited in an account set up by petitioner to

effectuate his fraudulent scheme. *Cf. Santos,* 553 U.S. at 512-13, 534 (Justice Scalia's four-

Justice plurality opinion distinguished the federal money-laundering statute's use of the term

"proceeds" from the term used by fourteen states, *including Ohio*, in their money-laundering

statutes). *Santos*, therefore, is inapposite in resolving whether petitioner's payment of $3,000 to

the architects from the corporate account was proscribed by Ohio's money-laundering statute.

Second, the undersigned disagrees with petitioner's argument that he could not be found

guilty of money laundering because he did not "acquire" the funds that he transferred to the

architectural firm from the account of a "valid corporate entity," containing monies contributed

by him as well as his partners. Ohio Rev. Code § 1315.55(H) broadly defines "proceeds" as also

including property "derived directly or indirectly from, produced through, realized through, or

---

[6]It is noted that, as respondent has pointed out in the return of writ (Doc. 9, Brief, p. 13), Congress effectively over-turned the *Santos* plurality decision by amending 18 U.S.C. § 1956 in May 2009 to provide a definition of "proceeds." *See, e.g., United States v. Morris,* Crim. Act. No. 6:09-16-S-DCR, 2010 WL 1049936, at *2 (E.D. Ky. Mar. 19, 2010). Under the statutory amendment, "proceeds" now means "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, *including the gross receipts of such activity.*" 18 U.S.C. § 1956(c)(9) (emphasis added).

caused by an act or omission." Contrary to petitioner's contention, a rational trier of fact could infer from the evidence presented at trial that petitioner did not make any capital contributions to Treadstone and that the registered corporation was not a legitimate business enterprise, but rather the fraudulent means established and used by petitioner to obtain or exert control over the three other men's funds for his own personal use. Therefore, petitioner's argument that the evidence was insufficient to establish his personal interest in Treadstone's capital assets lacks merit.

Finally, it was reasonable for the Ohio Court of Appeals to conclude that sufficient evidence was presented at trial to establish beyond a reasonable doubt that petitioner issued the $3,000 check to the architectural firm not as a payment of a "legitimate corporate expense," but rather for the purpose of furthering the commission of his "prior, ongoing and future unlawful activity." (Doc. 9, Ex. 8, p. 2). Although Nelvagal, Nasca and Smith authorized the payment, they believed at that time that they were involved in a legitimate business venture with petitioner. Nelvagal testified that if petitioner had not paid the architects $3,000 for their initial design renderings, he would have become suspicious and likely would have "pull[ed] back," taking his money out of the account and asking for explanations. At that time, the investors still owed over $60,000 to satisfy their agreement to each invest $50,000 in the business venture. Therefore, a rational trier of fact could have inferred that petitioner made the payment to the architectural firm to ensure that his unlawful activity (*i.e.*, theft of monies invested into the sham enterprise) would continue.

Accordingly, in sum, the undersigned concludes that the record evidence, viewed in the light most favorable to the prosecution as required under *Jackson*, is sufficient to support a reasonable inference that when petitioner paid $3,000 to the architectural firm from the Treadstone account in January 2006, he conducted a transaction "with the purpose of committing

or furthering the commission of corrupt activity," knowing that the monies then in the account, which had been received from Nelvagal and Nasca, were "proceeds of some form of unlawful activity." Therefore, a rational trier of fact could find petitioner guilty beyond a reasonable doubt of money laundering, as defined in Ohio Rev. Code § 1315.55(A)(1), based on that transaction.

In any event, the Ohio Court of Appeals' adjudication of the sufficiency-of-evidence issue, as argued in Grounds One and Two of the petition, withstands scrutiny under the deferential standard of review set forth in 28 U.S.C. § 2254(d) to be applied in this federal habeas case. It is clear from the record that, at the very least, "fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *See Harrington,* 131 S.Ct. at 786. Because the state courts' adjudication of the issues raised in Grounds One and Two thus is neither contrary to nor an unreasonable application of clearly-established federal law as determined by the Supreme Court in *Jackson,* petitioner is not entitled to relief based on such claims.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 4) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in Grounds Three and Four of the petition, which this Court has concluded are waived and thus procedurally barred from review, because under the first prong of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[7]

---

[7]Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in the defaulted grounds for relief. *See Slack,* 529 U.S. at 484. However, it is noted that as discussed above in

A certificate of appealability also should not issue with respect to the remaining non-defaulted claims alleged in Grounds One and Two of the petition because petitioner has not made a substantial showing that he has stated a "viable claim of the denial of a constitutional right" or that the issues presented in the remaining grounds are "adequate to deserve encouragement to proceed further." *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:   10/18/2011   
   <small>cbc</small>

      s/Karen L. Litkovitz
      Karen L. Litkovitz
      United States Magistrate Judge

---

addressing petitioner's argument of "cause" for his default of the claim alleged in Ground Four challenging the imposition of consecutive sentences without judicial fact-finding, petitioner does not state a viable constitutional claim in that ground for relief.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANDREW MITTOWER,                          Case No. 1:10-cv-750
    Petitioner

    vs                                    Spiegel, J.
                                                   Litkovitz, M.J.

WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,
    Respondent


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☑ Agent
                         ☐ Addressee

B. Received by ( *Printed Name* ) | C. Date of Delivery

1. Article Addressed to:

Andrew Mittower # 575-846
Chillicothe Corr. Inst.
PO Box 5500
Chillicothe, OH 45601

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*            ☐ Yes

2. Article Number
   *(Transfer from service label)*

7003 2260 0002 6723 4217

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540